SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

LEXINGTON INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
AMERICAN INTERNATIONAL
UNDERWRITERS INSURANCE
COMPANY AND CHARTIS SPECIALTY
INSURANCE COMPANY,

Plaintiffs,

- against -

MGA ENTERTAINMENT, INC.,

Defendant.

------------------------------------------------------- X

MGA ENTERTAINMENT, INC.,

Counterclaimant,

- against -

LEXINGTON INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
AMERICAN INTERNATIONAL
UNDERWRITERS INSURANCE
COMPANY, CHARTIS SPECIALTY
INSURANCE COMPANY, AND CRUM &
FORSTER SPECIALTY INSURANCE
COMPANY,

Counterdefendants.

------------------------------------------------------- X

**OPINION AND ORDER**

12 Civ. 3677 (SAS)



SHIRA A. SCHEINDLIN, U.S.D.J.:

1

## I.    INTRODUCTION

Lexington Insurance Company ("Lexington"), National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), American International Underwriters Insurance Company ("AIU"), and Chartis Specialty Insurance Company ("Chartis") (collectively, "Plaintiffs") bring this action seeking a declaration that they were not obliged to defend or indemnify MGA Entertainment, Inc. ("MGA") in connection with an action brought against MGA in this Court,[1] *Bernard Belair v. MGA Entertainment, Inc.* ("Underlying Action").[2]  The present action was brought in the Central District of California and transferred to this Court on May 9, 2012 pursuant to 28 U.S.C. § 1404.[3]  MGA now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) on the issue of duty to defend against National Union and Chartis ("the Umbrella Insurers"),

---

[1]    *See* Complaint ("Compl.") ¶ 8.

[2]    831 F. Supp. 2d 687 (S.D.N.Y. 2011).  This Court granted summary judgment to MGA in an action for copyright infringement brought by Bernard Belair, finding that only Belair's particular and original expression of "an absurdly large-headed, long limbed, attractive, fashionable woman" with heavy makeup was protectible, since generally "exaggerated and idealized proportions are (distressingly) commonplace in both children's toys and the fashion industry."  *Id.* at 698, 694.  Accordingly, this Court found that Belair's images were not substantially similar to the Bratz line of absurdly-proportioned and heavily made-up dolls.  *See id.* at 696.

[3]    *See* Dkts. 73-74; *infra* Part IV.A.

2

and against counterdefendant Crum & Forster Specialty Insurance Company ("C&F") (together with the Umbrella Insurers, "the Insurers").  The Umbrella Insurers and C&F cross-move[4] on the duty to defend issue and on MGA's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Lexington joins in the Umbrella Insurers' cross-motion.[5] For the following reasons, MGA's motion as to the Umbrella Insurers is granted in part and denied in part, and its motion as to C&F is denied.  The Umbrella Insurers' cross-motion is granted in part and denied in part, while Lexington's cross-motion is granted.  C&F's cross-motion is granted.

## II.   BACKGROUND[6]

### A.    The Insurance Policies

Plaintiffs issued primary commercial general liability insurance and

---

[4]    C&F also moves, in the alternative, for partial summary judgment based on a number of narrower grounds.  *See* C&F's Notice of Cross-Motion for Summary Judgement or Partial Summary Judgment at 2-3.

[5]    *See* Lexington's Notice of Joinder and Joinder in Cross-Motion for Summary Judgment, Dkt. 127.

[6]    The parties do not genuinely dispute the following facts.  While the Umbrella Insurers equivocate by responding to many of MGA's undisputed facts with "[d]isputed to the extent that the purported undisputed fact differs from, mischaracterizes, or is inconsistent with the" complaint in the Underlying Action or the Policies, in many instances no specific dispute is actually provided. Umbrella Insurers' Response to Statement of Undisputed Facts Filed by MGA ¶¶ 3; 23.  This Court will consider all facts responded to in this manner as undisputed.

commercial "umbrella" liability insurance policies to MGA for the years 1999 through 2007.[7] Counterdefendant C&F issued a general liability policy for the years 2003, 2004, and 2005.[8] At issue on these motions are the policies issued by National Union and Chartis for the years 2001 and 2002, respectively, and the policy issued by C&F for the year 2003 (together, "Policies").[9]

MGA suggested in its opening brief as to C&F that MGA sought summary judgment regarding the duty to defend with respect to policies issued by C&F in 2004 and 2005.[10] However, MGA now concedes that a multi-media exclusion contained in the C&F policies for 2004 and 2005 "excluded liability arising out of the publication of an advertisement" for those years.[11] As such, C&F had no duty to defend for the years 2004 and 2005.

Lexington issued general liability policies to MGA for the years 2006

---

[7]     *See* Insurance Policies from 1999 through 2007, Compl. Exs. 1-11.

[8]     *See* C&F Primary General Liability Policies ("C&F Policies"), Ex. 11 to 4/8/13 Request for Judicial Notice submitted by MGA ("MGA RJN").

[9]     *See* MGA's Memorandum in Support of Motion for Summary Judgment Against National Union and Chartis ("MGA Umbrella Insurers Mem.") at 3. *See also* MGA's Memorandum in Support of Motion for Summary Judgment Against C&F ("MGA C&F Mem.") at 3.

[10]    *See* MGA C&F Mem. at 3.

[11]    MGA's Statement of Genuine Issues in Opposition to C&F's Cross-Motion for Summary Judgment ("MGA Statement") at 18.

4

and 2007 ("Lexington Policies"), but MGA does not move for summary judgment on the duty to defend under those policies.[12]  This is likely because the Lexington Policies contain an exclusion barring coverage for advertising injury "committed or alleged to have been committed in any advertising . . . in the conduct of the insured's advertising . . . or other publishing activities," ("advertising exclusion").[13]  Because the crux of MGA's argument is that the Complaint filed in the Underlying Action made allegations "sufficient to suggest a claim that MGA's advertising . . . infringed Belair's copyrights,"[14] the Lexington Policies' advertising exclusion necessarily negates coverage with respect to the Underlying Action. Accordingly, Lexington had no duty to defend in the Underlying Action and its cross-motion is granted.

National Union issued a commercial umbrella policy to MGA providing coverage from January 1, 2001 through January 1, 2002 ("2001 Policy").[15]  Chartis issued a similar policy covering January 1, 2002 through January 1, 2003 ("2002 Policy") (together with the 2001 Policy, "Umbrella

---

[12]     *See* Supplemental Declaration of Mark Sheridan, counsel to Lexington ("Supp. Sheridan Decl."), Exs. O-P.

[13]     *Id*.

[14]     MGA Umbrella Insurers Mem. at 2.

[15]     *See* National Union Policy for 2001 ("2001 Policy"), Ex. 5 to Compl.

Policies").[16]  The Umbrella Policies provide coverage and a defense against

liability that is not covered under MGA's commercial liability insurance, but is

covered by the Umbrella Policies.[17]  The Umbrella Policies impose a duty to

defend MGA against "any claim or suit seeking damages" for an "Advertising

Injury."[18]  This duty is limited, however, in several ways.  *First*, the Umbrella

Policies provide for coverage in suits alleging an injury "arising solely out of [the

insured's] Advertisement"[19] as a result of, in relevant part, "infringement upon

another's copyright, trademark, or slogan in [the insured's] Advertisement."[20]

"Advertisement" is defined as "a paid broadcast, publication or telecast to the

general public or specific market segments about [the insured's] goods, products or

services for the purpose of attracting customers or supporters."[21]  To qualify for

coverage under the Umbrella Policies, the Advertising Injury alleged in the suit

---

[16]    *See* Chartis Policy for 2002 ("2002 Policy"), Ex. 6 to Compl.  Since they are virtually identical, the two Umbrella Policies are described and referred to together unless a distinction is necessary.

[17]    *See* MGA Umbrella Insurers Mem. at 3.  *See also* 2001 Policy at 183; 2002 Policy at 228.

[18]    2001 Policy at 183.

[19]    The 2002 Policy refers to "advertising activities" rather than the insured's "Advertisement."  2002 Policy at 230.

[20]    2001 Policy at 185.

[21]    *Id*.

must be one that "takes place during the Policy Period."[22] *Second*, the Umbrella Policies do not apply to "[a]vertising injury: . . . arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the Policy Period," ("prior publication exclusion").[23]

C&F issued a commercial general liability policy to MGA covering the year 2003 ("C&F Policy"), which offered coverage similar to that provided by the Umbrella Policies.[24] The only meaningful distinction between the C&F Policy and the Umbrella Policies is that the C&F Policy provides coverage in suits alleging an injury "arising out of" the insured's infringement of another's copyright in the insured's advertisement,[25] *i.e.*, it does not contain the "arising solely out of" language.[26] Like the Umbrella Policies, the C&F Policy limits coverage to suits arising out of an alleged offense that occurred during the policy

---

[22]     *Id*. at 182.

[23]     *Id*. at 196.

[24]     *See* C&F Policy, Ex. A to Declaration of Eric Tibak, counsel to C&F ("Tibak Decl.").

[25]     *Id*. at 10.

[26]     2001 Policy at 185.  The C&F Policy also defines "advertisement" slightly differently, as "a notice that is broadcast or published to the general public or specific market segments about [the insured's] goods, products or services for the purpose of attracting customers or supporters."  C&F Policy at 9.

period, and contains a prior publication exclusion.[27]

### B.    The Underlying Complaint

Bernard Belair filed the Underlying Action in October 2009, asserting, in relevant part, a cause of action for copyright infringement against MGA.[28]  Belair, an artist and photographer, created a series of images ("Belair Images") to be used in advertisements for Steve Madden shoes in the late 1990's.[29]  The Underlying Complaint alleges that the Belair Images – for which Belair received sixteen Certificates of Registration from the U.S. Copyright Office – have "large heads, large oval eyes, small bodies and large feet."[30]  Belair alleges further that Carter Bryant, a then-employee of MGA, testified in *Mattel, Inc. v. MGA Entertainment, Inc.*[31] that he created a series of sketches ("Bryant Sketches")

---

[27]    *See* C&F Policy at 8.  The C&F Policy's prior publication exclusion is almost identical to that of the Umbrella Policies; it bars coverage for advertising injury "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."  *Id*.  As such, no distinction will be made between the Policies' prior publication exclusions.

[28]    *See* Complaint in *Belair v. MGA Entm't, Inc.*, No. 09 Civ. 8870, Ex. A to Declaration of Mark Sheridan, counsel to the Umbrella Insurers ("Sheridan Decl.").  The Second Amended Complaint in the Underlying Action ("Underlying Complaint") will be referenced herein since it is the most current.  *See* Ex. C to Sheridan Decl.

[29]    *See* Underlying Complaint ¶ 3.

[30]    *Id*. ¶¶ 9-11.

[31]    No. CV 05-2727 (C.D. Cal. filed April 13, 2005).

inspired by Belair's Steve Madden advertisements, which sketches formed the basis for the Bratz line of toys and dolls.[32]  The Underlying Complaint alleges that the Bryant Sketches, the sculpts made from those sketches, and the Bratz dolls are all "substantially similar" to the Belair Images.[33]  However, no specific allegations are made regarding which sketches, sculpts, or dolls are substantially similar to which of Belair's sixteen copyrighted images.[34]  Rather, the Underlying Complaint alleges broadly that "[t]he [Bryant Sketches] and sculpts, and Bratz dolls, are substantially similar to the Belair Images" since the Bryant Sketches and Bratz dolls – when compared to the Belair Images – contain several "nearly identical features," have similar "character, fashion styling and posture;" have "significant resemblances in their overall proportions;" and have substantially similar "clothing and accessories that portray a young, fashionable look."[35]

On the basis of this purported substantial similarity, the Underlying Complaint alleges that MGA infringed Belair's copyrighted images (1) "by

---

[32]   *See* Underlying Complaint ¶¶ 13-14.  The Underlying Complaint alleges that "sculpts" or "sculpt drawings" were made based on the Bryant Sketches, and that those sculpts became molds for the Bratz dolls.  *See id*. ¶ 13.

[33]   *Id*. ¶ 22.

[34]   *See id*. ¶¶ 22-23.

[35]   *Id*.

copying the Belair Images to create the Bratz line of dolls, toys, games and videos based on the Belair Images;" (2) "by creating derivative works of the Belair Images in the Bratz line of dolls, toys, games and videos;" and (3) "by distributing and selling the Bratz line of dolls, toys, games and videos."[36]  The allegations are temporally vague; the Underlying Complaint declares that "MGA has infringed and will continue to infringe" the sixteen copyrighted images.[37]  The Underlying Complaint designates as infringing items the following: (1) Bratz dolls; (2) Bratz toys; (3) Bratz games; (4) Bratz videos; (5) Bratz packaging; and (6) Bratz "marketing materials."[38]  That is, the Underlying Complaint alleges copyright infringement based on the entire Bratz line of products.  The Underlying Complaint seeks, among other relief, to permanently enjoin MGA from "manufacturing, producing, publishing, displaying, [or] distributing . . . any work that infringes" on the Belair Images, and to recover damages pursuant to the alleged infringement.[39]

### C.   The Refusal to Defend

---

[36]   *Id.* ¶ 34.

[37]   *Id.*

[38]   *Id.* ¶ 28.

[39]   *Id.* at 9.

MGA tendered the Complaint in the Underlying Action to the
Umbrella Insurers and C&F on October 27, 2009.[40]  C&F denied coverage on
December 30, 2009,[41] and the Umbrella Insurers denied coverage on March 26,
2010.[42]  MGA tendered the Second Amended Complaint (*i.e.*, the Underlying
Complaint) to C&F in October 2010, and C&F denied coverage again in January
2011.[43]

In denying coverage, the Umbrella Insurers made two basic
arguments: (1) that the Underlying Action did not assert a claim for damages
arising out of an Advertising Injury as defined in the 2001 and 2002 Policies, and
(2) that, even if such a claim was asserted, the prior publication exclusion barred
coverage under the policies because the first Bratz prototypes were exhibited in
November 2000.[44]  The Umbrella Insurers maintained that the "undisputed facts

---

[40]    *See* 10/27/09 Letters from MGA to National Union, Chartis, and C&F,
Exs. 7-8 to Declaration of Michelle Darringer, counsel to MGA ("Darringer
Decl.").

[41]    *See* 12/30/09 Letter from C&F to MGA ("C&F Letter"), Ex. 10 to
Declaration of Michael Bidart, counsel to MGA ("Bidart Decl.").

[42]    *See* 3/26/10 Letters from National Union and Chartis to MGA
("National Union Letter" and "Chartis Letter," respectively), Exs. M-N to Sheridan
Decl.

[43]    *See* MGA Statement at 9.  *See also* 1/13/11 Letter from C&F to MGA,
Ex. M to Declaration of Jennifer Kokes, counsel to C&F ("Kokes Decl.").

[44]    *See* Chartis Letter at 2-4; National Union Letter at 2-4.

11

developed in the Bryant Action[45] establish that the first publication of the allegedly infringing Carter Bryant sketches took place in 2000."[46]  C&F made the same arguments, but asserted that the prior publication exclusion applies because the Bryant Sketches were first published in 2001, not 2000.[47]  Moreover, C&F concluded that the "material" published prior to the policy period  – *i.e.*, the dolls or sketches published in 2000 or 2001 – was "substantially similar" to any other allegedly infringing work published during the policy period, such that the prior publication exclusion would preclude coverage completely as to the Underlying Action.[48]

### D.    Extrinsic Evidence Regarding First Date of Publication

In their letters denying coverage in the Underlying Action – and their motions here – the Insurers reference extrinsic evidence to support their arguments that the first allegedly infringing Bratz sketches or dolls were published in 2000 or,

---

[45]    The "Bryant Action" refers to *Bryant v. Mattel, Inc.*, No. CV 04-9049 (C.D. Cal. filed November 2, 2004).  The Bryant Action was consolidated with *Mattel Inc. v. MGA Entertainment, Inc.*, No. CV 05-2727 (C.D. Cal. filed April 13, 2005).  The consolidated action will be referred to herein as the *Mattel* Action.

[46]    National Union Letter at 2; Chartis Letter at 2.

[47]    *See* C&F Letter at 13.

[48]    *See id*. at 14.

alternatively, 2001.[49]  The Umbrella Insurers rely on the testimony of MGA CEO

Isaac Larian ("Larian") that the "first exhibition" of "just the [Bratz] drawings"

(*i.e.*, the Bryant Sketches) was in November 2000 when the drawings were

"presented to retailers."[50]  Larian also testified that "[the Bryant Sketches] were

further exhibited in Hong Kong in January 2001,"[51] and that "[t]he Bratz dolls were

first publicly made available for sale at the retail level in August 2001 in the

USA."[52]  The Umbrella Insurers also reference a December 2000 email to a

Walmart buying agent which included several of the Bryant Sketches as

---

[49]     *See* National Union Letter; Chartis Letter; C&F Letter; Sheridan Decl.
Exs. D-H, L; Kokes Decl. Exs. C-L.  Much of this evidence was offered in the
*Mattel* Action.  *See, e.g.*, Kokes Decl. Exs. C-L.

[50]     Testimony of Isaac Larian ("Larian Testimony"), Ex. E to Sheridan
Decl., at 1797:19-25.  The Umbrella Insurers also reference the testimony of a
then-MGA employee, Margaret Leahy, who testified to having a meeting in
October 2000 with a vendor discussing, apparently, the possibility of making a
silicon mold based on the Bryant Sketches.  *See* Testimony of Margaret Leahy
("Leahy Testimony"), Ex. H to Sheridan Decl., at 4154-4156.  The Umbrella
Insurers reference this testimony as being contained in Exhibit F to the Sheridan
Declaration.  *See* Brief in Opposition to MGA's Motion for Partial Summary
Judgment Against National Union and Chartis ("Umbrella Insurers' Mem.") at 18.
It is, in fact, contained in Exhibit H.  *See* Leahy Testimony.  Carter Bryant testified
that he met with Leahy around October 2000 so that Leahy "could have an idea of
what to sculpt."  Testimony of Carter Bryant ("Bryant Testimony"), Ex. K to
Kokes Decl., at 2563:14-16.

[51]     Affidavit of Isaac Larian ("Larian Aff."), Ex. D to Sheridan Decl., ¶
13.

[52]     *Id*.

attachments.[53]  The Umbrella Insurers do not cite the text of the email, which
reads: "Please see attached pictures & photos for the fashion dolls that we are
going to present to Ron in Jan. In fact, this series of dolls is one of our key items
for 2001. [¶] Please note that those pictures are **preliminary** concept drawings and
are for your **reference only**. The final products may vary when we put these in
production. However, we will have mockups/working samples available in Jan
[2001] Toy Show."[54]

C&F relies on a variety of evidence in support of its argument[55] that
the date of first publication of the allegedly infringing Bratz products is no later
than 2001.  *First*, Certificates of Registration from the United States Copyright
Office for many of the Bryant Sketches include a first publication date of February
12, 2001.[56]  *Second*, testimony of the then-managing director of MGA Hong Kong
establishes that Bryant and MGA entered into an agreement to design and develop
the Bratz line in 2000, and that "17 initial concept and design drawings of the

---

[53]      *See* National Union Letter at 2; Chartis Letter at 2;

[54]      12/14/00 Email from Eric Yip to Eling Poon ("2000 Email"), Ex. J. to
Kokes Decl., at 97 (emphasis in original).

[55]      *See* C&F's Memorandum in Opposition to MGA's Motion for
Summary Judgment ("C&F Mem.") at 20.  C&F argues, more precisely, that MGA
first began "distributing and selling" the Bratz line in 2001.  *See id*.

[56]      *See* Kokes Decl. Ex. C at 27; Ex. D at 34; Ex. E at 50.

[Bratz] dolls," *i.e.*, the Carter Bryant sketches, were made by Bryant in 2000.[57]

Many of those sketches contain a handwritten "contract date" of September 2000.[58]

*Third*, the 2000 Email (also referenced by the Umbrella Insurers) establishes that

the "**preliminary** concept drawings" would be converted into samples and

presented at a January 2001 toy show.[59]

## III.   LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the moving party shows

"that there is no genuine dispute as to any material fact and [that the party is]

entitled to judgment as a matter of law."[60]  "A genuine dispute exists if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party.  A fact is material if it might affect the outcome of the suit."[61]

The movants "bear[] the burden of establishing the absence of any

---

[57]   Affirmation of Lee Shiu Cheung ("Cheung Aff."), Ex. F to Kokes Decl., at ¶¶ 5-7.

[58]   Ex. G to Kokes Decl., at 70-84.

[59]   2000 Email at 97.

[60]   Fed. R. Civ. P. 56(a).

[61]   *Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr.*, 489 Fed. App'x 513, 514 (2d Cir. 2012) (quotations omitted).

genuine issue of material fact."[62]  To defeat the movants' motions, the party

opposing the motion "must show more than 'some metaphysical doubt as to the

material facts,'"[63] and "may not rely on conclusory allegations or unsubstantiated

speculation."[64]

In deciding these motions, I must "construe the facts in the light most

favorable to the non-moving party," that is, to Plaintiffs and C&F with respect to

MGA's motion and to MGA with respect to Plaintiffs' and C&F's motions, "and

must resolve all ambiguities and draw all reasonable inferences against the

movant[s]," that is, against MGA with respect to its motion, and against Plaintiffs

and C&F with respect to their motions.[65]  However, "'[c]redibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge.'"[66]  "[T]he role of the court is not to

---

[62]     *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[63]     *Gioia v. Forbes Media LLC*, 501 Fed. App'x 52, 54 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[64]     *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9 (2d Cir. 2013) (quotations omitted).

[65]     *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (quotations omitted).

[66]     *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

16

resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[67]

The summary judgment standard regarding the duty to defend is unique in that – rather than precluding summary judgment – "any factual dispute affecting the existence of [insurance] coverage creates a potential for coverage and a duty to defend."[68]  "Once a prima facie showing is made that the underlying action fell within coverage provisions, an insurer may defeat a motion for summary judgment [on the duty to defend] only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy."[69]  "Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages . . . will fall within the scope of coverage, therefore add no weight to the scales.  Any seeming disparity in the respective burdens merely reflects the substantive law."[70]

---

(emphasis removed).

[67]     *Cuff ex. rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012) (quotations omitted).

[68]     *State Farm General Ins. Co. v. Mintarsih*, 175 Cal. App. 4th 274, 284 n.6 (2009).

[69]     *Anthem Elec., Inc. v. Pacific Emp'rs Ins. Co.*, 320 F.3d 1049, 1060 (9th Cir. 2002).

[70]     *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993).

17

## IV.   APPLICABLE LAW

### A.   California State Law Applies

"A district court sitting in diversity applies the law of the forum state."[71]  When a case has been transferred under 28 U.S.C. § 1404, the "forum state" is the state where the action was originally filed, *i.e.*, California.[72]  "[T]he transferee district court must be obligated to apply the state law that would have been applied if there had been no change in venue."[73]

### B.   Insurance Contract Interpretation

> Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties . . . at the time the contract is formed. . . .  The clear and explicit meaning of [the contract's provisions], interpreted in their ordinary and popular sense . . . controls judicial interpretation.[74]

---

[71]    *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717, 723 (S.D.N.Y. 2003).

[72]    *See id*.

[73]    *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

[74]    *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006) (quotations and citations omitted).

Coverage clauses are interpreted broadly,[75] while "exceptions and exclusions in the insurance policy are strictly construed against the insurer and liberally interpreted in favor of the insured."[76]

### C.   Insurers' Duty to Defend

"An insurer has a very broad duty to defend its insured under California law."[77]  Such duty "is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded."[78]  Specifically, an insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy."[79]  While "the insured need only show that the underlying claim *may* fall within policy coverage[,] the insurer must prove it *cannot*."[80]  "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor."[81]

---

[75]    *See Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995).

[76]    *Delgado v. Heritage Life Ins. Co.*, Cal. App. 3d 262, 270 (1984).

[77]    *Anthem*, 302 F.3d at 1054.

[78]    *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1080 (1993).

[79]    *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) (emphasis in original).

[80]    *Montrose v. Superior Court*, 6 Cal. 4th at 300 (emphasis in original).

[81]    *Horace Mann*, 4 Cal. 4th at 1081.

> The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy.  Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.[82]

Moreover, "remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the [duty to defend];"[83] the duty to defend is likewise triggered by "facts stated or fairly inferable in the complaint [which] . . . suggest a claim potentially covered by the policy."[84]  This is true "regardless of the technical legal cause of action pleaded by the third party."[85]  The California Supreme Court has also "recognized that the insured is entitled to a defense if the underlying complaint . . . might be amended to give rise to a liability that would be covered under the policy."[86]  As such, an insurer "cannot construct a formal fortress of the [underlying complaint's] pleadings and retreat behind its walls.  The pleadings are malleable, changeable and amendable. . . . [C]ourts do not examine

---

[82]   *Id.*

[83]   *Pension Trust Fund for Operating Eng'rs v. Federal Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002).

[84]   *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 655 (2005).

[85]   *Barnett v. Fireman's Fund. Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001).

[86]   *Montrose v. Superior Court*, 6 Cal. 4th at 299.

only the pleaded word but the potential liability created by the suit."[87]

Yet the duty to defend is not unlimited. "[W]here the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability."[88] "[T]he insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."[89] While a court will consider facts fairly inferable from – and potential amendment to – the underlying complaint, "any such amendment must be supported by the facts already pled in the complaint. . . . [and][a]n insurer will not be compelled to defend its insured when the potential for liability is "tenuous and farfetched."[90] "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability"[91] or "speculate about unpled third party claims to manufacture coverage."[92]

---

[87]    *Gray*, 65 Cal. 2d at 276.

[88]    *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995).

[89]    *Gray*, 65 Cal. 2d at 275 n.15.

[90]    *The Upper Deck Co., LLC v. Federal Ins. Co.*, 358 F.3d 608, 615 (9th Cir. 2004) (quotations omitted).

[91]    *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1114 (1995).

[92]    *The Upper Deck*, 358 F.3d at 615 (quotations omitted).

### D.    Advertising Injury

For a court to consider an "advertising injury" covered by the liability policy, "it must find that: (1) there is a causal connection between allegations in the third party complaint and the insured's advertising activities; and (2) the allegations in the third party complaint fit into one of the enumerated offenses in the [policy] that could be considered advertising injuries."[93]  The "causal connection" prong requires that "any of the policy's enumerated advertising injuries must be *caused by* [the insured's] advertising."[94]  That is, "the *advertising activities* must *cause* the injury – not merely expose it."[95]  As an example, a claim for patent infringement will not invoke advertising injury coverage where the insured's advertisements "exposed" the alleged infringement by promoting the allegedly infringing product.[96]  This is because "'a patent is infringed by making

---

[93]    *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1139 (9th Cir. 2003) (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1273-74 (1992)).  In other words, prong (2) requires that the allegations in the underlying complaint invoke the potential for coverage under the policy as described *supra* Part IV. C.

[94]    *Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219, 1221 (9th Cir. 1996) (emphasis in original).

[95]    *Id*. at 1223 (emphasis in original).

[96]    *Id*. at 1222.

using, or selling a patented invention, not by advertising it,'"[97] and therefore the advertising could not have caused the injury alleged.  By contrast, "infringement of copyright . . . typically occurs upon unauthorized reproduction or distribution of protected material. . . . [T]he injury emanates within the advertisement itself and requires no further conduct."[98]

### E.    Prior Publication Exclusion

A policy's prior publication exclusion will bar coverage for "any copyright infringement injury that arose from an oral or written publication of material first published before the policy became effective."[99]  That is, there is no duty to defend if the allegedly infringing product, *e.g.*, a book, was sold before the insurance coverage began and continued to be sold during the policy period.[100] This is because "[t]he purpose of insurance is to spread risk – such as the risk that an advertising campaign might be deemed tortious – and if the risk has already

---

[97]    *Id.* (quoting *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1506 (9th Cir. 1994)).

[98]    *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 339 n.3 (9th Cir. 1996) (quotations and citations omitted) (citing *Bank of the West*, 2 Cal. 4th at 553).

[99]    *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 777 (9th Cir. 2009).

[100]    *See Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1072-73 (7th Cir. 2004).

materialized, what is there to insure?  The risk has become a certainty."[101]  As such, the prior publication exclusion bars coverage of:

> an insured's continuous or repeated publication of *substantially the same* offending material previously published at a point of time before a policy incepts, while *not* barring coverage of offensive publications made during the policy period which *differ in substance* from those published before commencement of coverage.[102]

"At some point a difference between the republished version of an unlawful work and the original version would be so slight as to be immaterial."[103]  But the prior publication exclusion "cannot save the insurer when the republication contains new matter that the plaintiff in the [underlying] suit against the insured alleges as fresh wrongs."[104]

A district court in California interpreted the C&F Policy's prior publication exclusion to bar coverage[105] in a suit against MGA which alleged, in

---

[101]   *Id*.

[102]   *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1183 (2000) (emphasis in original).

[103]   *Taco Bell*, 388 F.3d at 1073.

[104]   *Id*. at 1073-74.

[105]   *See* Unreported Decision in *MGA Entm't, Inc. v. Crum & Forster Specialty Ins. Co.*, No. CV 07-8376 (C.D. Cal. 2009) ("*MGA v. C&F*"), Ex. N to C&F's Request for Judicial Notice ("C&F RJN").

relevant part, copyright infringement based on the Bratz line of products.[106]  In an

unreported decision, the court determined that the prior publication exclusion

precluded coverage because the "thrust of the wrongs" alleged by the underlying

plaintiff "began before the relevant policy period" and because "[n]o part of the

complaint suggest[ed] that the underlying wrongful actions were different in any

substantive manner during 2003."[107]  As such, although it was probable that

"different advertising occurred" in 2003 than before the policy period began, such

a difference in material was irrelevant since – while the "precise characters,

fashions, and accessories may have changed," – there were "no allegations that

suggest any advertisement, disparagement, or copyright infringement occurred in

2003 that differed in substance from that which began in or about June 2001."[108]

### F.    Bad Faith

California law "implies in every contract, including insurance

---

[106]    *See Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1141 (9th Cir. 2009).

[107]    *MGA v. C&F* at 5.

[108]    *Id*. at 5-6.  Notably, the court in *MGA v. C&F* considered June 2001 the date of prior publication since the underlying complaint in that action identified June 2001 as the point in time at which MGA began advertising and selling the Bratz products.  *See id*. at 2.

policies, a covenant of good faith and fair dealing."[109]  To fulfill the implied covenant, "an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. . . . [and] cannot deny [a claim] without fully investigating the grounds for its denial."[110]  "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."[111]

Even if potential coverage exists under the policy, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability."[112]  The genuine issue rule, however,

> does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. . . .  [A]n insurer is not entitled to judgment as a matter of law where,

---

[109]   *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007).

[110]   *Id.*

[111]   *Waller*, 11 Cal. 4th at 36 (emphasis in original).

[112]   *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994).

viewing the facts in the light most favorable to the [insured], a jury could conclude that the insurer acted unreasonably.[113]

The "denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable.  A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim.  The insurer may not just focus on those facts which justify denial of the claim."[114]

## V.   DISCUSSION

### A.   Duty to Defend

#### 1.   Allegations of Advertising Injury

MGA argues that the Insurers had a duty to defend because the Underlying Complaint potentially sought damages for Advertising Injury based on copyright infringement.[115]  While MGA acknowledges that the Underlying Complaint did not pursue its claim for copyright infringement expressly on the theory that MGA's Bratz advertising infringed Belair's copyrights,[116] MGA contends that the Underlying Complaint's broad copyright infringement allegations

---

[113]   *Wilson*, 42 Cal. 4th at 723-24 (quotations omitted).

[114]   *Id*. at 721.

[115]   *See* MGA Umbrella Insurers Mem. at 13; MGA C&F Mem. at 12.

[116]   *See* MGA Umbrella Insurers Mem. at 13-14; MGA C&F Mem. at 13.

– together with its reference to (and attachment of) infringing "marketing materials" – permit a reasonable inference that the Underlying Action alleged a claim potentially covered by the Policies.[117]  The Insurers argue that the Underlying Complaint raised no potential for coverage since it did not expressly state that MGA infringed the Belair copyrights in MGA's advertising, but rather alleged copyright infringement in the creation, "distribution and sale"[118] of the Bratz products.[119]  The Insurers maintain that any potential for coverage under the Policies is "predicated on speculation about unpled third party claims,"[120] and that the "dots simply do not connect" between the facts alleged in the Underlying Complaint and a potentially covered Advertising Injury.[121]

Because the Underlying Complaint pleads facts sufficient to raise the possibility of coverage under the Policies, the Insurers' arguments are unavailing. All MGA must do is show that the Underlying Complaint – including remote facts therein,  any reasonable inferences drawn from those facts, and potential (but not

---

[117]    *See* MGA Umbrella Insurers Mem. at 13-14; MGA C&F Mem. at 12-14.

[118]    C&F Mem. at 10.

[119]    *See* Umbrella Insurers Mem. at 9-10; C&F Mem. at 9-10.

[120]    Umbrella Insurers Mem. at 12 (quotations omitted).

[121]    C&F Mem. at 12 (quotations omitted).

farfetched) amendments – included a claim that *may* have fallen within the Policies' Advertising Injury coverage.  The Underlying Complaint's plain language alleges facts sufficient to raise the possibility of a potentially covered claim: Its allegations – that the Carter Bryant sketches and all Bratz dolls are substantially similar to the Belair Images – are sweeping, and Belair sought redress based on "*any work* that infringes [his] copyright in the Belair images."[122]  The Underlying Complaint, as written, imposed potential liability on MGA for an Advertising Injury since, had Belair's suit been successful, MGA would have infringed the Belair copyrights every time it published or broadcast a Bratz advertisement.  That such advertisements existed and would allegedly infringe the Belair copyrights is reasonably inferable from the facts already pleaded in the Underlying Complaint.  Specifically, Belair's allegation that the Carter Bryant Sketches, Bratz dolls, Bratz toys, games, and videos all infringe Belair's copyrights, and that "millions" of those products have been sold[123] permits a reasonable inference that the allegedly infringing activities included not just the sale and distribution of the Bratz products, but the advertisement thereof.  The Underlying Complaint's reference to allegedly infringing Bratz "marketing

---

[122]    Underlying Complaint at 12 (emphasis added).

[123]    *See id.* ¶¶ 22, 26.

materials,"[124] its demand for recovery based on "any work that infringes"[125] the Belair copyrights, including economic damages therefrom,[126] and its demand that MGA cease "publishing"[127] such allegedly infringing materials make it entirely possible that the Underlying Action would seek damages based on an Advertising Injury as defined by the Policies.

Finally, the Underlying Complaint might have been amended to give rise to liability that would indisputably be covered under the Policies.  The Underlying Complaint's allegations are entirely consistent with a claim for copyright infringement based on Advertising Injury.  No further facts would need to be added to bring the Underlying Complaint indisputably within the coverage of the Policies:  An amendment adding the word "advertisement" between the words "distributing" and "and" to the sentence "MGA has infringed and will continue to infringe Bernard Belair's copyrighted Belair images by . . . distributing and selling the Bratz line"[128] would have done so.  The potential for liability based on an

---

[124]     *Id.* ¶ 26.  Such allegedly infringing materials were also attached to the Underlying Complaint.  *See* Ex. A to Sheridan Decl. at 83.

[125]     Underlying Complaint at 12.

[126]     *See id.*

[127]     *Id.*

[128]     *Id.* ¶ 49.

Advertising Injury, then, is not tenuous and farfetched.

The Insurers' attempt to liken this case to ones where California courts have found no duty to defend based on the speculative nature of unpled third party claims is unsuccessful.  In the cases relied upon by the Insurers, unpled claims were considered speculative because, unlike here, the claims were not supported by facts already alleged in the underlying complaint.[129]   Notably, in

---

[129]     *See, e.g.*, *Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Prop. Cas. Co. Of America*, 197 Cal. App. 4th 424 (2011).  The insured's policy required the insurer there to defend a suit seeking damages for "bodily injury," and the insurer refused to defend the underlying suit which "solely sought civil penalties . . . and injunctive relief."  *Id*. at 428.  The facts alleged in the underlying complaint did not support a claim for bodily injury since it was brought "on behalf of the general public" and did not allege any personal harm to the plaintiff.  *Id*. at 432.  That is, in order to allege a covered injury, the plaintiff in *Ulta Salon* would have had to amend the complaint in several fundamental ways, specifically, by bringing the suit on her own behalf; by including facts alleging that the insured's products caused her injury; and by seeking damages based on that personal harm.  Here, no such changes are necessary.  *See also Hurley Constr. Co. v. State Farm Fire & Cas. Co.*, 10 Cal. App. 4th 533 (1992).  There, the underlying complaint alleged that the insured conspired with a co-defendant in a scheme to defraud the underlying plaintiff.  *See id*. at 536-37.  The insured's policy provided coverage for claims alleging bodily injury and damage to tangible property, and the underlying suit alleged only economic and punitive damages based on the alleged insurance fraud scheme.  *See id*. at 539.  "No facts . . . were alleged to suggest that [the underlying plaintiff] was attempting to recover money paid . . . for property damages or personal injuries."  *Id*.  Moreover, even if such bodily injury or property damage had been alleged, no duty to defend existed because the damages asserted did not arise from an accidental occurrence as required by the policy.  *See id*.

*Gunderson v. Fire Insurance Exchange*[130] the unpled claims were insufficient to

trigger a duty to defend because the underlying complaint's claims would have

been contradicted by the very claim that would have triggered that duty.[131]   Here,

the potential liability for damages based on an Advertising Injury is not based on

speculative potential facts or on claims that were conspicuously and intentionally

never pled; rather, it stems from the Underlying Complaint's sweeping allegations

that the entire Bratz line infringed Belair's copyrights; the reasonable inference

that such alleged infringement would have been committed in MGA's advertising;

and the possibility that Belair could have amended his complaint by adding one

word to bring it indisputably within the coverage of the Policies.  The potential

liability created by the Underlying Action included the possibility that MGA would

---

[130]     37 Cal. App. 4th 1006 (1995).

[131]     There, plaintiff in the underlying suit sought quiet title to a piece of
real property as well as declaratory and injunctive relief disputing the insured's
claim to a right of way easement.  *See id*. at 1110, 1115.  The underlying complaint
did not seek damages and specifically alleged that any monetary relief would not
adequately compensate plaintiff.  *See id*. at 1110.  As such, the insurer had no duty
to defend where the policy provided coverage for "all damage from an occurrence
which an insured is legally liable to pay because of . . . property damage covered
by the [p]olicy."  *Id*. (quotations omitted).  The underlying complaint contained no
facts – nor could any be reasonably inferred – alleging damage to property.  *See id*.
at 1116.  In fact, adding such a claim would have "conflicted with [the underlying
plaintiff's] claims of title to the right-of-way based on [the insured's]
abandonment."  *Id*.  That is, the amendment of the underlying complaint in
*Gunderson* to allege an injury covered by the policy would have undercut the
underlying plaintiff's main legal argument.

be found liable for damages based on Advertising Injury.

### 2.    Causation Requirement

The Insurers argue that, even if the Underlying Complaint included allegations sufficient to infer that MGA allegedly infringed the Belair copyrights in its advertising, the duty to defend was not triggered because the injury did not "aris[e] out of"[132] copyright infringement in MGA's advertisement, *i.e.*, the injury alleged was not caused by the advertising itself.[133]  MGA responds that – because injury from copyright infringement in an advertisement emanates within the advertisement itself – any injury caused by such alleged infringement would necessarily have been caused by that advertisement.[134]  I agree.

The Insurers' argument is based on the mistaken premise that any MGA advertisement with an allegedly infringing Bratz image on it would merely expose the underlying alleged infringement and not *cause* such infringement.  All

---

[132]    C&F Policy at 10.  The language of the Umbrella Policies is slightly different, requiring that the injury alleged arose "solely out of" copyright infringement in the insured's advertisement.  2001 Policy at 185.  The Umbrella Insurers urge this Court to adopt a more stringent causal connection requirement on the basis of the "solely out of" language.  *See* Umbrella Insurers Mem. at 13. Because the California courts have not seen fit to adopt this heightened causal connection requirement, I decline to do so.

[133]    *See* C&F Mem. at 14-16; Umbrella Insurers Mem. at 13.

[134]    *See* MGA Umbrella Insurers Mem. at 14; MGA C&F Mem. at 14.

parties agree that the causal connection requirement is not met where an advertisement merely exposes an underlying injury,[135] but the Insurers fail to recognize that in the context of copyright infringement, the advertisement is not merely the vehicle by which infringement is revealed: The infringement emanates within the advertisement.  The distinction between exposing an injury and causing one is illustrated by the cases cited by the Insurers:  In suits alleging *patent infringement*, an advertisement for an allegedly infringing product does not cause such injury because, as a matter of law, patent infringement cannot occur in the course of advertising activities.[136]  The advertising merely exposes the alleged infringement.  In contrast, any MGA advertising including images of Bratz products would *constitute* the alleged infringement, not expose it.[137]  As such, the

---

[135]     *See* C&F Mem. at 17-18; Umbrella Insurers Mem. at 13-14; MGA Mem. at 11.

[136]     *See Iolab*, 15 F.3d at 1505.  *See also, e.g.*, *Simply Fresh Fruit*, 94 F.3d 1219.  There, the underlying complaint alleged that the insured had infringed the underlying plaintiff's patents in its fruit-cutting device.  *See id.* at 1220-21.  The court determined that no causal nexus existed between the patent infringement alleged and the insured's advertisement of its fruit-cutting devices, since a patent "is infringed by making, using, or selling a patented invention, not by advertising it."  *Id.* at 1222-23.  As such, the advertising could not, as a matter of law, cause the alleged injury.  *See id*.

[137]     The Umbrella Insurers also argue that the causal nexus requirement is not met because the Underlying Complaint alleges only that the Bratz products – not the advertisement thereof – infringed the Belair copyrights.  *See* Umbrella Insurers Mem. at 16.  The Umbrella Insurers maintain that "[t]he products

causal nexus requirement is met.

### B.      Prior Publication Exclusion

Though the Underlying Complaint alleges facts creating potential

liability for a covered Advertising Injury, the prior publication exclusion acts to bar

coverage under the 2002 and 2003 Policies since it is undisputed that the allegedly

infringing Bratz products were first published no later than 2001.  MGA argues

that the Bratz line cannot be aggregated into a single concept, so that even if the

first Bratz product was published prior to the respective policy periods, later

infringements could constitute "fresh wrongs"[138] for which the prior publication

exclusion does not bar coverage.[139]  The Umbrella Insurers argue that the prior

publication exclusion bars coverage for 2001 and 2002 because the first Bratz

material was published in 2000, and any material published during the policy

periods was substantially the same as that first published in 2000 such that the

---

themselves are not advertisements, however defined."  *Id.*  However, as discussed
*supra* Part V.A.1, the allegations were broad enough to impose potential liability
on MGA for copyright infringement in its advertisement of the Bratz products.
Moreover, the allegations were not limited to the Bratz products themselves; the
Underlying Complaint included as examples of allegedly infringing materials two
drawings or graphics of the Bratz dolls meant to advertise or market the products.
*See* Ex. A to Sheridan Decl. at 83-84.

[138]      *Taco Bell*, 388 F.3d at 1073.

[139]      *See* MGA Umbrella Insurers Mem. at 15-17; MGA C&F Mem. at 15-16.

exclusion bars coverage for both years.  C&F makes an almost identical argument, but bases it on the premise that "[i]t is undisputed that MGA first began distributing and selling the Bratz line in 2001."[140]

        MGA's argument is not persuasive.  The prior publication exclusion will not bar coverage where the underlying complaint alleges both infringement of a basic idea published before the policy period *and* infringement of subordinate ideas published during the policy period.  But here, the Underlying Complaint made one basic (though sweeping) allegation: that the entire Bratz line infringed all sixteen of Belair's copyrights because all such Bratz products are substantially similar to all of the Belair Images.[141]  Had Belair alleged that a particular Bratz doll infringed a particular copyright in 2000 and that a second doll infringed a second copyright in 2002, the latter allegation could constitute a fresh wrong.  But he did not – and "the duty to defend is determined by what is charged in the complaint."[142]  *Taco Bell* does not support MGA's argument since the premise of Judge Posner's holding was that the "Psycho Chihuahua" concept could not be aggregated for the purposes of the prior publication exclusion precisely because the

---

[140]    C&F Mem. at 20.

[141]    *See* Underlying Compl. ¶ 26.

[142]    *Taco Bell*, 388 F.3d at 1074.

underlying complaint alleged that the concept included both a "basic idea" and "subordinate but still protected [] ideas."[143]  The Underlying Complaint here contains no such allegations.  While the insurer cannot invoke the prior publication exclusion where the republication of allegedly infringing material "contains new matter that the plaintiff in [the underlying suit] alleges as fresh wrongs,"[144] so too an insured cannot avoid application of the exclusion by reading into the underlying complaint a degree of specificity or nuance which it never contained.

It is entirely possible – indeed, probable – that alleged infringements occurring during the Policy Periods were different than the alleged infringement which occurred when the first Bratz material was published.  But the prior publication exclusion bars coverage when allegedly infringing material which is republished is substantially the same as that which was published before the policy period began.  Like the underlying complaint in *MGA v. C&F*, there are no allegations here suggesting that any alleged infringement occurred in 2002 or 2003 that differed in substance from that which began when the allegedly infringing material was first published.  As such, the Underlying Complaint alleges no fresh wrongs which would allow this Court to treat alleged infringements occurring

---

[143]   *Id*. at 1073.

[144]   *Id*.

during the Policy Periods as distinct from the original alleged infringement for the purposes of the prior publication exclusion.

In relying on the Ninth Circuit's decision in *Mattel Inc. v. MGA Entertainment, Inc.*,[145] MGA conflates the law applicable in copyright infringement suits with the law applicable in duty to defend suits.  MGA is correct in stating that, "for the purposes of copyright infringement, the Bratz cannot be aggregated into a single general concept . . . because those are not protectable concepts in dolls.  Any copyright claim had to focus on much narrower characteristics."[146] Indeed, that is precisely why the Underlying Action was dismissed on summary judgment.[147]  But the question here is not whether the Underlying Complaint alleged legally successful claims – it did not – but rather whether the Underlying Complaint alleged fresh wrongs sufficient to prevent the prior publication exclusion from acting to bar coverage for alleged infringement occurring in 2002 and 2003.  Again, it did not.  Accordingly, there was no potential for coverage under the Chartis policy issued for 2002 or the C&F policy issued for 2003.

---

[145]     616 F.3d 904 (9th Cir. 2010).

[146]     MGA Memorandum in Reply to C&F ("MGA C&F Reply Mem.") at 15.

[147]     *See Belair v. MGA Entm't*, 831 F. Supp. 2d at 694 ("exaggerated and idealized proportions are (distressingly) commonplace in both children's toys and the fashion industry, and Belair cannot assert a protectible claim to them.").

Nevertheless, the Umbrella Insurers had a duty to defend in the Underlying Action because the extrinsic evidence produced does not conclusively eliminate the potential for coverage under the 2001 Policy.  The Umbrella Insurers argue that the prior publication exclusion bars coverage under the 2001 Policy because the first Bratz material was published in 2000, not 2001.[148]  This position is, at the very least, debatable.  The Umbrella Insurers' argument is disputed by C&F and called into question by evidence showing that the Bratz dolls were first sold in the United States in August 2001[149] and that Certificates of Registration from the Copyright Office reveal the date of publication of the Bryant Sketches to be February 12, 2001.[150]  Because "any factual dispute affecting the existence of [insurance] coverage creates the potential for coverage and a duty to defend,"[151] this Court need not consider whether the first allegedly infringing Bratz material was published in 2000 or in 2001.  The mere existence of a factual dispute regarding the first date of publication establishes that the Umbrella Insurers had the duty to defend in the Underlying Action.

---

[148]    *See* Umbrella Insurers Mem. at 18.

[149]    *See* Larian Aff. ¶ 13.

[150]    *See* Kokes Decl. Ex. C at 27; Ex. D at 34; Ex. E at 50.

[151]    *Mintarsih*, 175 Cal. App. 4th at 284 n.6.

### C.    Bad Faith

The Insurers argue that MGA's bad faith counterclaim should be dismissed as a matter of law because the Insurers had no duty to defend or, in the alternative, that their refusal to do so was reasonable because there existed a genuine issue as to their duty to defend.[152]  MGA responds that summary judgment should be denied because, viewing the facts in the light most favorable to MGA, a jury could conclude that the Insurers acted unreasonably by failing to give sufficient weight to factors which triggered the duty to defend in the Underlying Action.[153]  At the outset, MGA's claim for bad faith against C&F must be dismissed because C&F had no duty to defend the Underlying Action.

The bad faith claim against the Umbrella Insurers must also be dismissed because, even considering MGA's version of the facts, there is a genuine issue as to the Umbrella Insurers' duty to defend the Underlying Action under the 2001 Policy.  It is undisputed that the Underlying Complaint did not use the word "advertising" or "advertisement," let alone pursue the copyright infringement claim expressly on the theory that MGA's advertising infringed Belair's copyrights.[154]

---

[152]    *See* C&F Mem. at 24-25; Umbrella Insurers Mem. at 22-24.

[153]    *See* MGA C&F Reply Mem. at 20-21; MGA Memorandum in Reply to the Umbrella Insurers at 20-21.

[154]    *See* Underlying Complaint.

40

Moreover, at least some evidence reflects that the first allegedly infringing Bratz material was made known to individuals outside of MGA in 2000.[155] These undisputed facts raise a genuine issue as to (1) whether the Underlying Complaint imposed potential liability on MGA for an Advertising Injury as defined in the 2001 Policy, and as to (2) whether the prior publication exclusion barred coverage in the Underlying Suit. Thus, the Umbrella Insurers did not act unreasonably as a matter of law in refusing to defend MGA in the Underlying Action.

## VI.   CONCLUSION

MGA's motion for summary judgment is granted in part and denied in part. The Umbrella Insurers' cross-motion is granted in part and denied in part. Lexington's cross-motion is granted for the reasons stated *supra* pages 4-5. C&F's cross-motion is granted. The Clerk of the Court is directed to close these motions [Docket Nos. 97, 100, 108, 113, 130]. A telephone status conference in this case is scheduled for Wednesday, July 31 at 4:30 p.m.

SO ORDERED:

Dated:     New York, New York          Shira A. Scheindlin
           July 9, 2013                U.S.D.J.

---

[155]     *See* 2000 Email.

41

**Appearances**

**For Plaintiffs and Counterdefendants
Lexington Insurance Company, National
Union Fire Insurance Company of
Pittsburgh, PA, American International
Underwriters Insurance Company, and
Chartis Specialty Insurance Company:**

Mark D. Sheridan, Esq.
Mark C. Errico, Esq.
Patton Boggs LLP
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102
(973) 848-5600

**For Defendant and Counterclaimant
MGA Entertainment, Inc:**

Michael J. Bidart, Esq.
Ricardo Echeverria, Esq.
Shernoff Bidart Echeverria Bentley LLP
600 S. Indian Hill Blvd.
Claremont, California 91711
(909) 621-4935

**For Counterdefendant Crum & Forster
Specialty Insurance Company:**

Susan J. Field, Esq.
Musick, Peeler & Garrett LLP
One Wilshire Blvd., Suite 2000
Los Angeles, California 90017
(213) 629-7886